**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Anthony Patek (State Bar No. 228964)
  anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT FOR THE

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROL LESH and SARAH COLEMAN, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VNGR BEVERAGE, LLC,<br><br>Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUD, DECEIT AND/OR MISREPRESENTATION; UNFAIR BUSINESS PRACTICES; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

### INTRODUCTION

1.    Plaintiffs Carol Lesh and Sarah Coleman, by and through their counsel, bring this class action, on behalf of themselves, the general public, and those similarly situated, for violations of the Consumer Legal Remedies Act, Unfair Competition Law, and False Advertising Law, and for common law fraud, deceit and/or misrepresentation and unjust enrichment against VNGR Beverage, LLC d/b/a Poppi ("Poppi" or "Defendant"). The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

2.    This case concerns Defendant's false and deceptive labeling, advertising, marketing, and sale of its soft drink, Poppi, with the label claims "FOR A HEALTHY GUT"; "BE GUT HAPPY. BE GUT HEALTHY."; "Prebiotics For A Healthy Gut;" and "Prebiotic Soda." These healthy gut representations lead consumers, who are increasingly interested in

getting health benefits from their food and beverages, to believe that consuming the Poppi soda with improve their gut health. Consumers are attracted to products marketed as "healthy" or "better for you," like the Poppi sodas, because consumers are interested in products that they believe will promote and improve their health relative to alternative foods and beverages, many of which are not healthy (or even unhealthy).

3.      In truth, Defendants' soft drink is not beneficial to gut health. Defendant's gut health claims are based on its inclusion of prebiotic fiber in the sodas. However, Defendant's Poppi sodas are not a "good source" of prebiotic fiber under FDA regulations—they contain only 2 grams of fiber per 12 oz. serving. Consumers would need to consume several cans of Poppi sodas each day to ingest a significant amount of fiber. And that fiber is agave inulin, a branched form of inulin whose prebiotic efficacy has been studied relatively little compared to other, linear forms of inulin. The few clinical studies that have been performed using agave inulin suggest that it may not be as effective as other prebiotic fibers in promoting gut health, and that it has more adverse effects such as bloating and abdominal pain.

4.      Furthermore, the Poppi sodas contain added sugar (between 3-5 grams), which is harmful to the gut and overall health. Consuming beverages with added sugar like the Poppi sodas disrupts the balance of the gut microbiome and increases the risk of metabolic disease, cardiovascular disease, type 2 diabetes, and liver disease, and is further associated with increased all-cause mortality.

5.      Accordingly, Defendant's manufacturing, labeling, and advertising of the Poppi sodas with the product label claims "FOR A HEALTHY GUT"; "BE GUT HAPPY. BE GUT HEALTHY."; "Prebiotics For A Healthy Gut;" and "Prebiotic Soda" is unlawful, misleading, and designed to deceive consumers into purchasing Poppi soda at a substantial price premium. Plaintiffs bring this action to stop Defendant's misleading practices.

## **PARTIES**

6.      Plaintiff Carol Lesh is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Berkeley, California.

7.     Plaintiff Sarah Coleman is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Sacramento, California.

8.     Defendant VNGR Beverage, LLC d/b/a Poppi is incorporated in the state of Texas and has its principal place of business in Austin, Texas.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

10.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

12.     In accordance with California Civil Code Section 1780(d), Plaintiff Lesh concurrently files herewith a declaration establishing that, at various times throughout the class period, she purchased Poppi sodas in several flavors from a local Whole Foods Market grocery store while located in California. (Plaintiff Lesh's declaration is attached hereto as Exhibit A.)

13.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

**Defendant's Products**

14.     Defendant manufactures, distributes, markets, advertises, and sells a variety of flavored sodas under the brand name "Poppi."

15.     Poppi sodas come in a variety of flavors, including, Orange Cream, Lemon Lime, Strawberry Lemon, Orange, Doc Pop, Ginger Lime, Raspberry Rose, Grape, Cherry Limeade,

Wild Berry, Watermelon, Classic Cola, and Root Beer. These products, and any other flavors or Poppi sodas that have made a claim during the Class Period that the beverage is gut healthy, promotes a healthy gut, or is a (or contains) prebiotics, will be referred to herein as the "Products" or the "Poppi sodas."

16.     The representations that the Poppi sodas are "FOR A HEALTHY GUT"; "BE GUT HAPPY. BE GUT HEALTHY."; and "Prebiotics For A Healthy Gut" were uniformly communicated on the principal display panel of the product labels purchased by Plaintiffs and every other person who purchased any of the Products during the Class Period. All Poppi sodas also contain the words "Prebiotic Soda" in large font on a tapered portion at the top of each can. An exemplar of the Product labels appears below. The same or substantially similar product label has appeared on each respective Product during the entirety of the Class Period.





17.     Defendant furthers these misrepresentations by making similar claims on its website and in its online marketing, such as the following:

Why Poppi? Soda's back. We're bringing soda back. The twist? It's better for you this time. No more hiding cans in the bottom of your recycling bin or sipping sparkling water with your burger and fries. You deserve that mouth-watering swirl of flavors and bubbles without feeling bad about it! Get all the soda feels with 5g sugar and 25 calories, or less, and prebiotics. Remember: cravings aren't a crime, people! It's time to love soda again. Like right now!"

What is Poppi? We all know that soda is delicious. It's undeniable. But most sodas are loaded with empty calories and excess sugar, so we decided to make a better one, Poppi's a modern soda that combines agave inulin, apple cider vinegar (ACV), and fruit juice to give you all the soda feels with 25 calories or less, 5g sugar or less, and prebiotics.

18.     Screenshots of the representations that Defendant made on its website are shown below:

why poppi?

# soda's back

We're bringing soda back. The twist? It's better for you this time.

No more hiding cans in the bottom of your recycling bin or sipping sparkling water with your burger and fries. You deserve that mouth-watering swirl of flavors and bubbles without feeling bad about it! Get all the soda feels with 5g sugar and 25 calories, or less, and prebiotics. Remember: cravings aren't a crime, people!

It's time to love soda again. Like right now!

## prebiotics 

Prebiotics are a special type of fiber that can act as food for healthy bacteria in your gut. Each can of poppi includes agave inulin, a prebiotic (and natural sweetener!) extracted from the agave tequilana plant.

## apple cider vinegar 

Every can of poppi contains apple cider vinegar (ACV). Ours is pure and unfiltered, so it contains the "mother," and gives our flavors a mouthwatering edge. Seriously, try it!

## 5g sugar or less 

Soda doesn't need piles and piles of sugar to taste amazing. Don't believe us? Take a sip!

## 25 calories or less 

The perfect side-kick to your burger, kale salad, chicken tenders, burrito bowl, sandwich, pho, pulled pork plate, pizza, tacos, sushi, fried rice, spaghetti and meatballs...need we go on?



CLASS ACTION COMPLAINT

19.     As noted above, Defendant defines "prebiotic" on its website to mean "a special type of fiber that can act as food for healthy bacteria in your gut." This definition parallels the generally accepted definition of "prebiotic" within the medical community.[1]

20.     By prominently labeling the Products as "Prebiotic," Defendant is effectively labeling them "fiber" sodas. On a practical level, Defendant is thus labeling the Products as a good source of fiber, using alternative words that communicate that meaning without being explicitly governed by FDA regulations.

21.     These claims demonstrate that Defendant intends for consumers, who do not typically have knowledge of prebiotic content, fiber and the effects of added sugar, to purchase the Products for the claimed health and gut health benefits.

**Consumer Demand for "Healthy" Food and Beverages**

22.     Many American consumers are health conscious and seek foods and beverages to improve their health, so they routinely take product label claims into consideration in selecting and purchasing food items. Nielsen recently reported that "Consumer demand for products that support their health and wellness is on the rise, and many beverage brands are filling that need. According to NIQ's 2023 Consumer Outlook, 46% of consumers identified physical or mental wellness as one of their top priorities in 2023."[2]

23.     Defendant's founders sought to exploit this demand with the Products. For example, Poppi's co-founder, Allison Ellsworth, stated in an interview: "I was interested in what food does for your body as medicine versus going the traditional route." Likewise, Poppi's other

---

[1] See, e.g., K. Zeratsky, R.D., L.D., "What Are Probiotics and Prebiotics?," Mayo Clinic website, Nutrition & Healthy Eating, available at https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/expert-answers/probiotics/faq-20058065 (accessed June 13, 2024) ("Prebiotics are foods (typically high-fiber foods) that act as food for human microflora.").

[2] https://nielseniq.com/global/en/insights/education/2023/the-future-of-beverages-sustainable-practices-and-wellness/#:~:text=Wellness%2DFocused%20Beverages%3A%20A%20Growing,their%20top%20priorities%20in%202023 (last accessed June 13, 2024).

co-founder, Stephen Ellsworth, said "We plan to really democratize healthy soda."[3]

**Prebiotic Content Derived from Agave Inulin**

24.     "Prebiotic" sodas are fortified with fiber. Scientists recognize prebiotic sodas as a form of fiber-fortified food.[4]

25.     On their website, Defendant defines prebiotics as "a special type of fiber that can act as food for healthy bacteria in your gut. Each can of Poppi soda includes agave inulin, a prebiotic (and natural sweetener!) extracted from the agave tequilana plant."[5] Prebiotics are plant fibers that help probiotics grow in the gut. Prebiotics are present in a variety of fiber-rich plant-based foods, including, whole grains, bananas, greens, onions, garlic, soybeans and artichokes.

26.     Inulin is a type of natural soluble fiber extracted from various plants that may function as a prebiotic. Inulin was identified as prebiotic early in the development of gut microbial research. One commentator noted that inulin is an example of a fiber that "can be chemically isolated and called a prebiotic, but . . . may or may not fulfill all of the scientific criteria required of a prebiotic" under modern criteria.[6]

27.     "Inulin" is a heterogeneous class of fructose polymers. It consists of chain-terminating glucosyl moieties and a repetitive fructosyl moiety, which are linked by $\beta(2,1)$ bonds. Inulins from different sources vary in structure. Agave inulin is composed of linear and branched fructose chains, connected with $\beta$-2,1 and $\beta$-2,6 linkages, and a degree of polymerization (DP) between 25 and 34 (i.e., 25 to 34 fructose subunits). In comparison, chicory inulin is linear with

---

[3] https://www.forbes.com/sites/simonmainwaring/2021/03/15/purpose-at-work-how-poppi-leverages-purpose-to-bring-health-to-soda/ (last accessed June 13, 2024).

[4] Ospina-Corral Sebastián, et al., *Prebiotics in Beverages: From Health Impact to Preservation*, A. Grumezescu, A. Holban, Preservatives and Preservation Approaches in Beverages, Pages 339-373 (Academic Press 2019) ("The consumption of foods and beverages containing added nutrients and fortification, including functional prebiotics is a current global consumer trend.").

[5] https://drinkpoppi.com/pages/benefits-101.

[6] Floch, Martin; "Prebiotics and dietary fiber," *Nutritional care of the patient with gastrointestinal disease, 1st ed. Boca Raton, FL: Taylor & Francis Group,* 89-110, at 91-92 (2015).

β-2,1 linkages and a DP that ranges from 2 to 60. Because their structures vary, inulin from different sources can have different biological effects. Most studies of the prebiotic effects of inulin use either short chain inulin (<10 units) or long chain, linear inulin.[7]

28.    As noted above, agave inulin is inulin extracted from agave plants specifically. One study on the prebiotic effects of agave inulin found an absence of any "significant changes" on markers of microbiome health, such as short-chain fatty acids ("SCFAs") and branched chain fatty acids ("BFCAs").[8] In particular, a recent meta-study on the effects of various prebiotics based on clinical trials noted that agave inulin had **no meaningful** impact on SCFAs or BFCAs, even when administered at 7.5 grams per day over a period of three weeks (the equivalent of almost four cans of Poppi soda per day).[9] Indeed, the authors of a randomized, double-blind clinical trial on prebiotic effects of agave inulin concluded that they "did not detect a significant treatment effect of agave inulin supplementation alone" on fecal butyrate, a molecule associated with positive effects. [10]

29.    Nutrition researchers examining the prebiotic properties of Poppi sodas have arrived at the same conclusions. A NPR journalist summarizing the available research concluded that "the purified fibers that are added to foods," such as Poppi, "get fermented faster, by microbes that live near where the small intestine meets the large intestine," meaning that they are unable to "reach the microbes living further down the large intestine"—where durable and

---

[7] *See* Hughes, Riley L., David A. Alvarado, Kelly S. Swanson, and Hannah D. Holscher. "The prebiotic potential of inulin-type fructans: a systematic review." *Advances in Nutrition* 13, no. 2, 492-529 (2022).

[8] Valentina Vinelli, et al., *Effects of Dietary Fibers on Short-Chain Fatty Acids and Gut Microbiota Composition in Healthy Adults: A Systematic Review,* NUTRIENTS vol. 14,13 2559. 21 Jun. 2022, available doi:10.3390/nu14132559.

[9] *Id.*

[10] Hannah D. Holscher, et al., *Agave Inulin Supplementation Affects The Fecal Microbiota Of Healthy Adults Participating In A Randomized, Double-Blind, Placebo-Controlled, Crossover Trial*, THE J. OF NUTRITION 145.9 (2015): 2025-2032. available doi.: 10.3945/jn.115.21733.

reliable gut changes occur.[11] Another dietitian stated that she does not recommend consuming the agave inulin found in sodas like Poppi because "not only can it cause a lot of gas, but it's not the same as an insoluble fiber."[12] Likewise, in an article published by Healthline, a gut health expert indicated that she "can't see much benefit" to drinking prebiotic sodas like Poppi, explaining that agave inulin "is a common trigger for bloating and gas, particularly for those with a sensitive digestive system, or people with irritable bowel syndrome (IBS)."[13]

30.     Further, at least one study showed increases in flatulence, bloating, and abdominal pain among healthy individuals ingesting agave inulin.[14] A review of this study compared to other clinical trials of inulin from various sources suggests that agave inulin is associated with more adverse effects than some other forms of inulin.[15]

**Sugar-Sweetened Beverage Consumption is Harmful to Gut and Overall Health**

31.     The Poppi sodas are sweetened with both added sugar and stevia. It is well-accepted in scientific literature that consumption of added sugar is harmful to the gut and overall health.

32.     Added sugar consumption detrimentally affects gut health in multiple ways. First, dietary sugar affects the balance of microbiota in the gut by fostering the growth of harmful

---

[11] NPR.org, *Prebiotic sodas promise to boost your gut health. Here's what to eat instead*, (August 8, 2023), *available* https://www.npr.org/sections/health-shots/2023/08/08/1192329196/gut-health- fiber-probiotic-olipop-poppi (last accessed May 20, 2024).

[12] Verywell Health*, Is There Such a Thing as Healthy Soda?*, (April 15, 2024), *available* https://www.verywellhealth.com/healthy-soda-is-it-actually-good-for-you-8630508 (last accessed May 20, 2024).

[13] Healthline, *Can Probiotic Soda Really Help Improve Your Gut Health?*, May 20, 2024, *available* https://www.healthline.com/health-news/probiotic-soda-gut-health-benefits#Potential-risks-of- drinking-probiotic-and-prebiotic-sodas (last accessed June 13, 2024).

[14] Holscher HD, et al., "Gastrointestinal tolerance and utilization of agave inulin by healthy adults", *Food Funct* 5(6):1142–9 (2014).

[15] Hughes, et al, *Advances in Nutrition* at 492-529 (2022).

microbiota and decreasing the growth of beneficial microbiota.[16] An overgrowth of harmful microbiota increases inflammation in the body, decreases immune system functionality, and increases gut permeability.[17] This can lead to small intestinal bacterial overgrowth (SIBO) and *Candida* overgrowth.[18]

33.     Even a short-term exposure to a high sugar diet increases susceptibility to colitis by increasing gut permeability, and eventually, leaky gut.[19] Leaky gut results in bacteria entering other parts of the body and perpetuating inflammatory bowel diseases.[20]

34.     Further, added sugar consumption overwhelms the pancreas and liver, leading to failure in their ability to properly regulate blood sugar.[21] As a result, the liver will convert excess fructose to fat, which is stored in the liver and released into the bloodstream. This process contributes to key elements of metabolic syndrome, including high blood fats and triglycerides, high cholesterol, high blood pressure, and extra body fat, especially in the belly.[22] Metabolic disease has been linked to type 2 diabetes, cardiovascular disease, obesity, polycystic ovary syndrome, nonalcoholic fatty liver disease, and chronic kidney disease. Higher consumption of

---

[16] Satokari, Reetta, "High Intake of Sugar and the Balance between Pro- and Anti-Inflammatory Gut Bacteria, " *Nutrients* 2020, 12(5), 1348; https://doi.org/10.3390/nu12051348.

[17] *Id.*; *see also* Garcia, et al., "Impact of Dietary Sugars on Gut Microbiota and Metabolic Health", *Diabetology* 2022, 3(4), 549-560; https://doi.org/10.3390/diabetology3040042.

[18] *Id.*

[19] Zhang, "Influence of Foods and Nutrition on the Gut Microbiome and Implications for Intestinal Health," *Int. J. Mol. Sci.* 2022, 23(17), 9588; https://doi.org/10.3390/ijms23179588.

[20] *Id.*

[21] Gugliucci A., "Sugar and Dyslipidemia: A Double-Hit, Perfect Storm," *Journal of Clinical Medicine*. 2023; 12(17):5660. https://doi.org/10.3390/jcm12175660.

[22] Te Morenga, L., et al., "Dietary sugars and body weight: systematic review and meta- analyses of randomized controlled trials and cohort studies," *BJM* (January 2013); https://doi.org/10.1136/bmj.e7492.

sugar-sweetened beverages is significantly associated with elevated cardiometabolic risk scores, including lower HDL "good" cholesterol, and higher triglycerides.[23]

35.     Additionally, while non-nutritive sweeteners ("NNSs") such as stevia are not metabolized in the same way as sugar, recent research suggests that stevia and other NNSs carry an enhanced risk of glucose intolerance, insulin resistance, diabetes and increased weight.[24]

**The Products Do Not Provide Gut Health Benefits**

36.     Attempting to overcome the deleterious health impact of the Products, Defendant added prebiotics to the Products and includes the claims, "FOR A HEALTHY GUT"; "BE GUT HAPPY. BE GUT HEALTHY."; "Prebiotics For A Healthy Gut;" and "Prebiotic Soda" on the label. These claims mislead reasonable consumers into believing that the Poppi sodas, and in particular the soda's prebiotic content, provides gut health benefits. The minimal amount of prebiotics in the Products will not provide consumers with the health benefits that Defendant's representations lead them to expect, and even worse, the Product is actually dangerous to consumers' health given the added sugar content.

37.     Defendant's claims of "FOR A HEALTHY GUT"; "BE GUT HAPPY. BE GUT HEALTHY."; "Prebiotics For A Healthy Gut;" and "Prebiotic Soda" and the other representations and images detailed herein in the marketing, labeling, and advertising of the Products is thus nothing more than a marketing gimmick intended to deceive consumers into purchasing the Products. Accordingly, Defendant's representations are misleading, deceptive, and unlawful.

38.     Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. Consumers would not know that the Products are unlawfully labeled. Its discovery requires investigation

---

[23] *See, e.g.*, Jiawei Yin, et al., "Intake of Sugar-Sweetened and Low-Calorie Sweetened Beverages and Risk of Cardiovascular Disease: A Meta-Analysis and Systematic Review," *Adv. Nutrition*, Volume 12, Issue 1 (2021), Pages 89-101, https://doi.org/10.1093/advances/nmaa084; and Fried, et al., "Sugars, hypertriglyceridemia, and cardiovascular disease," *Am. J. Clin. Nutr.* (October 2003), Pages 873S-880S; https://doi.org/10.1093/ajcn/78.4.873S.

[24] Garcia, et al., *supra*, at 549.

well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge to ascertain the dubious benefits of agave inulin as a prebiotic, and the harm to gut health associated with the added sugar content. Therefore, consumers had no reason to investigate whether the Products are an actual healthful source of prebiotics as the labels claim. Thus, reasonable consumers relied on Defendant's representations regarding the nature of the Products.

**Federal and State Regulations Governing Food Labeling**

39.     The FDA has promulgated a separate set of regulations that govern nutrient content claims made on the front of a package. 21 C.F.R. § 101.13. A nutrient content claim is a claim that "expressly or implicitly characterizes the level of a nutrient." 21 C.F.R. § 101.13(b). "Express" nutrient content claims include any statement outside the Nutrition Facts Panel about the level of a nutrient. 21 C.F.R. § 101.13(b)(1); 21 C.F.R. § 101.13(c). Stating information from the nutrition facts panel (such as grams protein per serving) elsewhere on the package necessarily constitutes a nutrient content claim. 21 C.F.R. § 101.13(c). A manufacturer cannot make a nutrient content claim in the form of a "statement about the amount or percentage of a nutrient" if the statement is "false or misleading in any respect." 21 C.F.R. § 101.13(i)(3).

40.     Under the FDA's "good source" nutrient content claim regulations, "the terms 'good source,' 'contains,' or 'provides' may be used on the label and in the labeling of foods . . . provided that the food contains 10 to 19 percent of the RDI or the DRV per reference amount customarily consumed." 21 C.F.R. § 101.54(c)(1).

41.     Under the FDA's "More" (i.e., "fortified") nutrient content claim regulations, "[a] relative claim using the terms 'more,' 'fortified,' 'enriched,' 'added,' 'extra,' and 'plus' may be used on the label or in labeling of foods to describe the level of . . . dietary fiber," provided that it meets the requirements of 21 C.F.R. § 101.54(e)(1) or –(2).

42.     Under § 101.54(e)(1), the food making the fortified fiber claim must "contain[] at least 10 percent more of the . . . DRV for . . . dietary fiber, . . . (expressed as a percent of the Daily Value) *per reference amount customarily consumed* than an appropriate reference food. 21 C.F.R. § 101.54(e)(1)(i). If the fortified fiber claim is "based on a nutrient that has been added to

the food," that fortification must be in accordance with the policy on fortification of foods in 21 C.F.R. § 104.20. See 21 C.F.R. § 101.54(e)(1)(ii). Finally, under 21 C.F.R. § 101.54(e)(1)(iii): (A) the identity of the reference food and the percentage (or fraction) that the nutrient is greater relative to the DRV must be declared "in immediate proximity to the most prominent such claim (e.g., contains 10 percent more of the Daily Value for fiber than white bread')"; and (B) quantitative information comparing the level of the nutrient in the product per labeled serving with that of the reference food that it replaces (e.g., 'Fiber content of white bread is 1 gram (g) per serving; (this product) 3.5 g per serving') must be declared adjacent to the most prominent claim or to the nutrition label. If the nutrition label is on the information panel, the quantitative information required by § 101.54(e)(1)(iii) may be located elsewhere on the information panel in accordance with § 101.2.

43.     Under 21 C.F.R. § 101.54(e)(2), a "fortified" fiber claim is permissible if it meets three requirements parallel to those of § 101.54(e)(1), but expressed *in relation to specific serving sizes*. First, the labeled food must contain at least 10 percent more of the DRV for dietary fiber (expressed as a percent of the Daily Value) *per 100g* of an appropriate reference food. 21 C.F.R. § 101.54(e)(2)(i). Second, it must comply with the fortification policy of § 104.20. 21 C.F.R. § 101.54(e)(2)(ii) Third, it must disclose relative quantity information parallel to that required by § 101.54(e)(1)(iii) above, expressed *per unit weight* of appropriate reference food (e.g., "contains 10 percent more of the Daily Value for fiber *per 3 oz than does 'X brand of product'"*). 21 C.F.R. § 101.54(e)(2)(iii).

44.     Additionally, the FDA has recently published a proposed rule in which it scrutinizes products that contain added sugar, thereby "add[ing] calories without contributing essential nutrients." 87 FR 59168, 59173. For this reason, the FDA recommends prohibiting Products with more than 5% DV of added sugars (i.e., 2.5 grams of sugar) from making a "healthy" claim. *Id.*

45.     Most of the flavors of the Products each have more than 2.5 grams of added sugar and thus exceed the FDA's proposed threshold for "healthy" claims.

46.     Identical federal and California laws regulate the content of labels on packaged

food and require truthful, accurate information on the labels of packaged foods. The requirements of the Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. §§ 101 and 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on the labeling of packaged food for sale in the United States.

47.     Under both the Sherman Law and FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or in its labeling. California Health & Safety Code § 110660; 21 U.S.C. § 343(a).

48.     Under the FDCA, the term *false* has its usual meaning of "untruthful," while the term *misleading* is a term of art that covers labels that are technically true, but are likely to deceive consumers. Under the FDCA, if any single representation on the labeling is false or misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

49.     In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations. *See* California Health & Safety Code § 110660 (misbranded if label is false and misleading); California Health & Safety Code § 110705 (misbranded if words, statements and other information required by the Sherman Law are either missing or not sufficiently conspicuous); and California Health & Safety Code § 110740 (misbranded if contains artificial flavoring, artificial coloring and chemical preservatives but fails to adequately disclose that fact on label).

50.     Under California law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, sold, or possessed. Misbranded products have no economic value and are legally worthless.

51.     Representing that a soft drink is "FOR A HEALTHY GUT"; "BE GUT HAPPY. BE GUT HEALTHY."; "Prebiotics For A Healthy Gut;" and are a "Prebiotic Soda" are all statements of fact, and use of these phrases on the labels of packaged beverages is limited by the aforementioned misbranding laws and regulations.

52.     Labeling the Products as "Prebiotic" is tantamount to labeling them as "good sources" of fiber and/or "fortified" with fiber. As such the Products are, or should be, subject to the same regulations as nutrient content claims for fiber, and are misbranded to the extent they imply they are good sources or fortified sources of fiber without actually being so (e.g., without actually providing 10% or more per serving of the DV for fiber), or without providing all the necessary information to support those claims (e.g., failing to identify the increase in fiber they offer relative to an appropriate reference food).

53.     Even if the Products do not violate the letter of the FDA's fiber nutrient content claim regulations, they violate the policies those regulations embody.

**Defendant Intends to Continue to Market the Products as Supporting Gut Health**

54.     Because consumers pay a price premium for products that contain prebiotics and offer gut health benefits, Defendant is able to both increase its sales and retain more profits by labeling its Products as improving gut health.

55.     Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of competitors' products that are not unlawfully labeled, and/or (ii) commanding a higher price for the Products because consumers will pay more for them due to consumers' demand for healthful products.

56.     Defendant continues to launch new flavors and diversify its portfolio to maintain its competitive edge, making it likely that Defendant will continue to misleadingly advertise the Products to perpetuate the misrepresentations regarding the healthfulness of the Products.

## PLAINTIFFS' EXPERIENCES

**Carol Lesh**

57.     Plaintiff Lesh, on more than one occasion, purchased various flavors of Poppi soda from a local Whole Foods Market grocery store in Berkeley, California.

58.     Plaintiff Lesh made each of her purchases after reading and relying on Defendant's product label claims "FOR A HEALTHY GUT"; "BE GUT HAPPY. BE GUT HEALTHY."; "Prebiotics For A Healthy Gut;" and "Prebiotic Soda." She believed the Products contained prebiotics that would improve her gut health and that consuming the Product would promote gut health.

59.     At the time of each of her purchases of the Products, Plaintiff Lesh did not know that the Products were misleadingly labeled and would not provide the claimed gut health benefits or that the Products would actually be harmful to her gut health. As a result of Defendant's misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to her.

60.     Plaintiff Lesh not only purchased the Products because of the unlawful and misleading labeling, but she also paid more money for the Products than she would have paid for other or a similar soda product that was not unlawfully labeled.

61.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff Lesh would not have purchased them or, at a very minimum, she would have paid less for the Products.

62.     Plaintiff Lesh continues to desire to purchase soda products, including those marketed and sold by Defendant. If the Products were reformulated and/or labeled without the unlawful claims, Plaintiff Lesh would likely purchase the Products again in the future. Plaintiff Lesh regularly visits stores where the Products and other sodas are sold.

**Sarah Coleman**

63.     Plaintiff Coleman, on more than one occasion, purchased various flavors of Poppi soda from a Safeway grocery store in Sacramento, California.

64.     Plaintiff Coleman made each of her purchases after reading and relying on Defendant's product label claims "FOR A HEALTHY GUT"; "BE GUT HAPPY. BE GUT HEALTHY."; "Prebiotics For A Healthy Gut;" and "Prebiotic Soda." She believed the Products contained prebiotics that would improve her gut health and that consuming the Product would promote gut health.

65.     At the time of each of her purchases of the Products, Plaintiff Coleman did not know that the Products were misleadingly labeled and would not provide the claimed gut health benefits or that the Products would actually be harmful to her gut health. As a result of Defendant's misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to her.

66.     Plaintiff Coleman not only purchased the Products because of the unlawful and misleading labeling, but she also paid more money for the Products than she would have paid for other or a similar soda product that was not unlawfully labeled.

67.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff Coleman would not have purchased them or, at a very minimum, she would have paid less for the Products.

68.     Plaintiff Coleman continues to desire to purchase soda products, including those marketed and sold by Defendant. If the Products were reformulated and/or labeled without the unlawful claims, Plaintiff Coleman would likely purchase the Products again in the future. Plaintiff Coleman regularly visits stores where the Products and other sodas are sold.

69.     Plaintiffs and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under California law and the products are misbranded; therefore, the Products are worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of the Class did not receive what they reasonably intended to receive.

## **CLASS ALLEGATIONS**

70.     Plaintiffs bring this class action lawsuit on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

> Class: All persons in the United States who purchased the Products between June 14, 2020 and the present.

> California Subclass: All persons in the state of California who purchased the Products between June 14, 2020 and the present.

71.     This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

72.     Numerosity: Plaintiffs do not know the exact size the Classes, but they estimate that each is composed of more than 100 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

73.     Common Questions Predominate: This action involves common questions of law and fact to the potential classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products provide the gut health benefits as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover. The questions of law and fact common to the Classes are:

a.     Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive and/or unlawful;

b.     Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are false and/or misleading;

c.     Whether labeling the Products with false and misleading claims causes them to command a price premium in the market as compared with similar products that do not make such misrepresentations;

d.     Whether Defendant's advertising and marketing regarding the Products sold to Class members was likely to deceive reasonable consumers;

e.     Whether representations regarding the prebiotics in the Products are material to a reasonable consumer;

f.     Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

g.     The amount of profits and revenues earned by Defendant as a result of the

conduct;

h.     Whether Class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

i.     Whether Class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

74.     Typicality: Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Classes were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

75.     Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all Class and Subclass members because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of class and subclass members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the classes. By prevailing on their own claims, Plaintiffs will establish Defendant's liability to all Class and Subclass members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Classes and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class and Subclass members.

76.     Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the classes to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

77.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

78.     Plaintiffs do not plead, and hereby disclaim, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## PLAINTIFFS' FIRST CAUSE OF ACTION

**(Violation of the Consumers Legal Remedies Act (the "CLRA"),
California Civil Code § 1750, *et seq.*)
On Behalf of Plaintiffs and the Subclass**

79.     Plaintiffs reallege and incorporate the paragraphs of this Class Action Complaint as if set forth herein.

80.     Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

81.     Plaintiffs and other Subclass members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

82.     The Products that Plaintiffs (and other similarly situated Subclass members) purchased from Defendant were "goods" within the meaning of California Civil Code § 1761(a).

83.     Defendant's acts and practices, set forth in this Class Action Complaint, led customers to falsely believe that the Products provided gut health benefits as claimed on the product package. By engaging in the actions, representations and conduct set forth in this Class

Action Complaint, Defendant has violated, and continues to violate, §§ 1770(a)(5) and § 1770(a)(7), of the CLRA. In violation of California Civil Code § 1770(a)(5), Defendant's acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code § 1770(a)(7), Defendant's acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another.

84.     Plaintiffs request that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs and the other members of the Subclass will continue to suffer harm. Plaintiffs and those similarly situated have no adequate remedy at law to stop Defendant continuing practices.

85.     **CIVIL CODE § 1782 NOTICE.** On or around January 23, 2024, Plaintiffs put Defendant on notice of its false and deceptive labeling, advertising, marketing, and sale of the Poppi soda by sending Defendant a demand letter. Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated Subclass members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

86.     Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PLAINTIFFS' SECOND CAUSE OF ACTION**

**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Plaintiffs and the Subclass**

87.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

88.     Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendant made deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

89.     Defendant made representations and statements (by omission and commission) that led reasonable customers to believe that consuming the Products would improve gut health, and marketed them as a good and/or fortified source of fiber.

90.     Plaintiffs and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing the Products or paying less for them.

91.     Defendant's acts and omissions are likely to deceive the general public.

92.     Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

93.     The aforementioned practices, which Defendant used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

94.     As a direct and proximate result of such actions, Plaintiffs and the other Subclass members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven

at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs, and those similarly situated, paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendant's false, deceptive and misleading advertising. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, Plaintiffs, and those similarly situated, will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

95.     Plaintiffs seek equitable relief, including restitution, with respect to their FAL claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action will not succeed. Plaintiffs and the Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiffs may not be able to establish each Subclass member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'").

96.     Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

97.     Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This

expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they are not entitled. Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## PLAINTIFFS' THIRD CAUSE OF ACTION

### (Common Law Fraud, Deceit and/or Misrepresentation)

### On Behalf of Plaintiffs and the Class

98.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

99.     Defendant has fraudulently and deceptively informed Plaintiffs that the Products are healthful sources of prebiotics, improve gut health, and marketed them as a good and/or fortified source of fiber.

100.     These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiffs, and material at the time they were made. Defendant knew or should have known the composition of the Products, the health impacts of the Products, and knew or should have known that the labeling of the Products as providing gut health benefits is misleading to consumers. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase the Products. In misleading Plaintiffs and not so informing Plaintiffs, Defendant breached its duty to them. Defendant also gained financially from, and as a result of, its breach.

101.     Plaintiffs, and those similarly situated, relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

102.     By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and those similarly situated to alter their position to their

detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, purchase the Products.

103.    Plaintiffs and those similarly situated justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant.

104.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

105.    Defendant's conduct as described herein was willful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

### PLAINTIFFS' FOURTH CAUSE OF ACTION

**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.*)**

**On Behalf of Plaintiffs and the Subclass**

106.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

107.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

108.    In particular, Defendant has engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R.

101.54, 21 C.F.R. 104.20, and 21 C.F.R. 101.65(d), which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

109.    Defendant has also engaged in unfair practices under the UCL by violating the FDA's policy against representing foods as good or fortified sources of fiber when they are not, as embodied in 21 C.F.R. § 101.54 and related regulations.

110.    In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, misrepresenting that the Products improve gut health, and are a good and/or fortified source of fiber.

111.    Plaintiffs and those similarly situated relied to their detriment on Defendant unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

112.    Defendant's acts and omissions are likely to deceive the general public.

113.    Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

114.    The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

115.    As a direct and proximate result of such actions, Plaintiffs and the other Subclass members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs and those similarly situated paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendant's misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis.

Alternatively, Plaintiffs, and those similarly situated, will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

116.   As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

117.   Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including restitution for the premium and/or the full price that they and others paid to Defendant as result of Defendant's conduct. Plaintiffs and the Subclass lack an adequate remedy at law to obtain such relief with respect to their "unfairness" claims in this UCL cause of action, because there is no cause of action at law for "unfair" conduct. Plaintiffs and the Subclass similarly lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the Sherman Law (Articles 3 and 6) and the Federal laws and regulations referenced herein do not provide a direct cause of action, so Plaintiffs and the Subclass must allege those violations as predicate acts under the UCL to obtain relief.

118.   Plaintiffs also seek equitable relief, including restitution, with respect to their UCL unlawfulness claims for violations of the CLRA, FAL and their UCL "fraudulent" claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiffs and the Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiffs may not be able to establish each Subclass member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiffs and the

Subclass may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

119.    Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

120.    Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### PLAINTIFFS' FIFTH CAUSE OF ACTION
#### (Unjust Enrichment)
### On Behalf of Plaintiffs and the Class

121.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

122.    Plaintiffs and members of the Class conferred a benefit on the Defendant by purchasing the Products.

123.    Defendant has been unjustly enriched in retaining the revenues from Plaintiffs' and Class members' purchases of the Products, which retention is unjust and inequitable, because Defendant falsely represented that the Products improve gut health and are a good and/or fortified source of fiber when, in fact, the Products do not meaningfully improve gut health and instead harm gut health. This harmed Plaintiffs and members of the Class because they paid a price premium as a result.

124.     Because Defendant's retention of the non-gratuitous benefit conferred on them by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution and nonrestitutionary disgorgement of profits to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court. Plaintiffs and those similarly situated have no adequate remedy at law to obtain this relief.

125.     Plaintiffs, therefore, seek an order requiring Defendant to make restitution and pay nonrestitutionary disgorgement of profits to them and other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgement against Defendant as follows:

A.     Certification of the proposed Class and Subclass, including appointment of Plaintiffs' counsel as class counsel;

B.     An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     An award of compensatory damages in an amount to be determined at trial, except as to those causes of action where compensatory damages are not available at law;

D.     An award of statutory damages in an amount to be determined at trial, except as to those causes of action where statutory damages are not available at law;

E.     An award of punitive damages in an amount to be determined at trial, except as to those causes of action where punitive damages are not available at law;

F.     An award of treble damages, except as to those causes of action where treble damages are not available at law;

G.     An award of restitution in an amount to be determined at trial, except as to those causes of action where restitution is not available at law;

H.     An award of nonrestitutionary disgorgement of profits in an amount to be determined at trial, except as to those causes of action where restitution is not available at law;

I.     An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

J.      For reasonable attorneys' fees and the costs of suit incurred; and

K.      For such further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 14, 2024

**GUTRIDE SAFIER LLP**

*/s/Seth A. Safier/s/*
Seth A. Safier (State Bar No. 197427)
    seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
    marie@gutridesafier.com
Anthony Patek (State Bar No. 228964)
    anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

# EXHIBIT A

DocuSign Envelope ID: 5D102368-4165-4CC7-B150-423A7B34BC39

1

2    I, Carol Lesh, declare:

3    1.    I am a Plaintiff in this action. If called upon to testify, I could and would

4    competently testify to the matters contained herein based upon my personal knowledge.

5    2.    I submit this Declaration pursuant to California Code of Civil Procedure section

6    2215.5 and California Civil Code section 1780(d).

7    3.    As set forth in my complaint, on multiple occasions within the past four years, I

8    purchased different flavors of the Poppi Prebiotic Soda from Whole Foods Market store while in

9    Berkeley, California.

10   I declare under penalty of perjury under the laws of California that the foregoing is true

11   and correct.

12   Executed on June 14, 2024, in Berkeley, California.

13

14

15   _____

16   Carol Lesh

17

18

19

20

21

22

23

24

25

26

27

28

-1-

DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION